UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

FLORIDA WILDLIFE FEDERATION, INC.;
CONSERVANCY OF SOUTHWEST
FLORIDA, INC.; and ENVIRONMENTAL
CONFEDERATION OF SOUTHWEST
FLORIDA, INC.,

       Plaintiffs,                          CASE NO. 4:12-cv-00355-RH/CAS

v.

UNITED STATES ARMY CORPS OF
ENGINEERS,

and

FLORIDA DEPARTMENT OF
ENVIRONMENTAL PROTECTION
AND SOUTH FLORIDA WATER
MANAGEMENT DISTRICT,

       Defendants.
_____/

**PLAINTIFFS' RESPONSE TO THE CORPS
OF ENGINEERS' MOTION TO DISMISS**

      The Plaintiffs respond as follows in opposition to the Corps of Engineers' Motion to Dismiss.

**Standard of Review**

      The Corps' motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) is a factual challenge to this Court's subject matter jurisdiction because the agency relies on extrinsic evidence and does not assert lack of jurisdiction solely on the basis of the pleadings. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003). Generally, "when a party raises a factual

1

attack to subject matter jurisdiction—as opposed to a facial challenge based merely on the allegations in the complaint—the district court is not obligated to take the allegations in the complaint as true." *Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1169 (11th Cir. 2011) (citation omitted), *cert. denied*, 132 S. Ct. 2379 (2012) (affirming district court's application of preponderance of the evidence standard).[1]  The district court has discretion to formulate a process for making factual determinations, *id.* at 1170, At issue there was the threshold jurisdictional question as to whether a sunken shipwreck was a Spanish warship and therefore immune from attachment under the Foreign Sovereign Immunities Act. *Id*. at 1169.  This Court should "independently weigh" evidence extrinsic to the complaint, and "is not constrained to view them in the light most favorable to the non-movant." *Id.*  The *Odyssey* court relied on *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994) where document and deposition discovery had been allowed and where the district court could have but was not required to conduct an oral evidentiary hearing.

### A. On its face, Section 1323(a) of the Clean Water Act Unequivocally Requires the Corps to Comply with State Water Quality Standards

The starting point in statutory interpretation is the "language of the statute itself." *United States v. James*, 478 U.S. 597, 604 (1986), *overruled on other grounds by Central Green Co. v. United States*, 531 U.S. 425 (2001).  Courts assume that "Congress used the words in a statute as they are commonly and ordinarily understood, and [courts] read the statute to give full effect to each of its provisions." *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999) (in a Medicare fraud case, interpreting whether the Injunctions Against Fraud Act, 18 U.S.C. § 1345,

---

[1] *Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel,* 675 F. Supp. 1126, 1133 (M.D. Fla. 2009).

authorized the issuance of an injunction to freeze property equal in value to the amount a defendant obtains through fraud).  Moreover, courts "do not look at one word or term in isolation, but instead . . . look to the entire statutory context."  *Id*.  Finally, "[c]ourts generally adhere to the principle that statutes relating to the same subject matter should be construed harmoniously if possible, and if not, that more recent or specific statutes should prevail over older or more general ones."  *Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 941 (11th Cir. 2001) (ship damage to coral reef recoverable under later enacted Park System Resources Protection Act despite conflict with earlier enacted Damages Limitation Act).

Under the Clean Water Act, all federal agencies must comply with state water pollution rules and laws, in the same manner and to the same extent as any nongovernmental entity.  33 U.S.C. § 1323(a).  Section 1323(a) provides, in relevant part, that:

> Each department, agency, or instrumentality of the . . . Federal Government . . . having jurisdiction over any property or facility, . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity . . . .  [This subsection] shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner.  This subsection *shall apply notwithstanding any immunity of such agencies, . . . under any law or rule of law*.

33 U.S.C. § 1323 (emphasis added).[2]  On its face, this provision both waives Corps' "immunity . . . under any law" and imposes a mandatory obligation on all federal facilities to comply with

---

[2] In 1977, Congress amended the Clean Water Act to overrule *Minnesota v. Hoffman*, 543 F.2d 1198 (8th Cir. 1976), in which the Eighth Circuit held that the Corps was exempt from compliance with state statutes and regulations relating to dredge and fill activities.  *Id*. at 1209.  Reacting to *Hoffman*, Congress specifically added Section 404(t) to make clear that the Corps "shall comply with such State or interstate requirements both substantive and procedural to control the discharge of dredged or fill material to the same extent that any person is subject to

3

state water quality standards.  *See Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1153 (9th Cir. 1998) (Under CWA, "all federal agencies must comply with state water quality standards. . . ."); *Marble Mountain Audubon Soc'y v. Rice*, 914 F.2d 179, 182-83 (9th Cir. 1990); *U.S. Dep't of Energy v. Ohio*, 503 U.S. at 619-22 (holding that the Clean Water Act authorized prospective, injunctive relief against federal agencies for violations of substantive standards, but did not permit civil penalties).

This waiver and corresponding obligation apply to the Corps' operations of the Central and Southern Florida Flood Control Project ("C&SF Project"), which was a multi-purpose project (see description of the Project *infra* at page 10).  Indeed, under its own rules, the Corps must develop water control plans for its projects, which must "include any applicable authorities established after project construction" and must be prepared "giving appropriate consideration to all applicable Congressional Acts relating to operation of Federal facilities," including the "Clean Water Act."  33 C.F.R. § 222.5(f).[3]  These rules acknowledge that the Corps must, in

---

such requirements."  Pub. L. No. 95-217, § 67(t), 91 Stat. 1566 (Dec. 27, 1977) (codified at 33 U.S.C. § 1344(t)).  In light of court decisions "misconstrue[ing] the original intent" of the CWA's federal facilities provision, Congress also amended Section 313 to "indicate unequivocally that all Federal facilities and activities are subject to all of the provisions of State and local pollution laws."  S.Rep. No. 95-370, at 67, 1977 U.S.C.C.A.N. at 4392.  In particular, Congress clarified that each federal agency "shall be subject to, and comply with all" state water pollution requirements in the same manner as "any nongovernmental entity," "notwithstanding any immunity . . . under any law or rule of law."  See Pub. L. No. 95-217, 61(a) (codified at 33 U.S.C. 1323(a)).  In *In Re Operation of the Missouri River System Litigation*, 418 F.3d 915, 918 n.4 (8th Cir. 2005), the Eighth Circuit considered only the legislative history relating to the Section 404(t) amendment.

[3] The Corps' regulations for  the preparation of water control manuals further explains that:

> compliance with Public Law 92-500 [the Clean Water Act] requires that all Federal facilities be managed, operated, and maintained to protect and enhance the quality of water and land resources through conformance with applicable Federal, State, Interstate, and local substantive standards.

operating the C&SF Project, comply with all state water pollution rules. Moreover, the regulations belie the notion that the Corps is absolutely immune from state water quality enforcement simply because navigation is listed as one of the authorized purposes of the project.

### B. Section 1371(a) of the Clean Water Act Does Not Provide the Corps with Absolute Immunity from Clean Water Act Enforcement for Violations of State Water Quality Standards Unrelated to Navigation

The Corps concedes that Section 1323(a) provides a waiver of sovereign immunity and permits some CWA challenges to be brought and certain remedies enforced against the United States. Corps' Br. at 5. The agency argues, however, that so long as navigation is one of the overall purposes of a Corps-operated project or activity, the "navigation exception" in 33 U.S.C. § 1371(a) [4] affords the agency an absolute immunity from liability for violations of state water pollution rules, regardless of whether the violations result from exercise of the Corps regulatory powers over navigation. This is so, the Corps contends, because the enforcement of state water quality standards against the Corps would necessarily "affect or impair" the agency's authority to maintain navigation.

This unduly expansive reading of section 1371(a) is not supported by a plain reading of the Clean Water Act, or the cases upon which the Corps relies. Moreover, it would effectively preclude enforcement of the CWA against *any* Corps' activity or facility, thereby rendering the waiver of immunity in Section 1323(a) meaningless. Indeed, a careful analysis of the language

---

Section 7-07, U.S. Army Corps of Eng'rs, Preparation of Water Control Manuals Reg. No. ER 1110-2-8156 at p. A-32 (Aug. 31, 1995) (bracketed material supplied). Exh. 7, p. A-32.

[4] The Clean Water Act, 33 U.S.C. § 1371(a) provides, in relevant part, that:

> [t]his chapter shall not be construed as (1) limiting the authority or functions of any office or agency of the United States under any other law or regulation not inconsistent with this chapter (2) affecting or impairing the authority of the Secretary of the Army (A) to maintain navigation or (B) under the Act of March 3, 1899 (30 Stat. 1112); . . .

and purpose of the Clean Water Act and the relevant cases reveals that the Corps' assertion of absolute insulation from liability for all CWA violations under Section 1371(a) is incompatible with the explicit waiver of immunity in Section 1323(a) of the Act. Instead, Sections 1323(a) and 1371(a) can and should be applied in a manner that gives meaning and effect to both provisions. The scope of the immunity conferred by Section 1371(a) should be determined not simply by the character of the federal project or its authorized purposes, but by the character and purpose of the activity that causes the relevant water quality violations.

### C. The Corps' Sweeping Interpretation of Section 1371(a)'s Navigation Exception Conflicts with the Supreme Court's Interpretation of a Similar Immunity Provision

The Corps' interpretation of Section 1371(a)'s "navigation exception" as an absolute bar to liability for state water quality violations, regardless of whether the violations are related to any navigational purpose, is inconsistent with the Supreme Court's interpretation of an analogous statutory provision in the Flood Control Act barring liability for damages arising out of the management of flood control projects. In *Central Green Co. v. United States*, 531 U.S. 425 (2001), the Court examined whether the Flood Control Act, which limited the waiver of sovereign immunity in the Federal Tort Claims Act, barred any liability for damages associated with flood control or the management of a flood control project, so long as the facility was operated, at least *in part*, for flood control purposes.[5] The Court concluded that it did not, and held that the scope of immunity conferred by the Act should be determined "not by the character

---

[5] The Flood Control Act of 1928 provides, in relevant part, that "[n]o liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c. In an earlier decision, the Supreme Court held that in enacting § 702c, Congress clearly sought to ensure beyond doubt that sovereign immunity would protect the Government from 'any' liability associated with flood control," and any liability arising out of the "management of a flood control project." *United States v. James*, 478 U.S. 597, 608, 610 (1986).

of the federal project or the purposes it serves" but by the actual purpose of the Corps' operations that gave rise to the damages claim. *Id*. at 434.

At issue in *Central Green* was whether the United States was liable for damages to plaintiffs' pistachio orchard allegedly caused by the negligent design, construction, and maintenance of the Madera Canal, which is a "branch" of a vast federal irrigation and flood control project known as the Central Valley Project. *Id*. at 427. The Central Valley Project was a "gigantic" and "integrated undertaking," consisting of:

> thirty-eight major dams and reservoirs bordering the valley floor and scores of smaller ones in headwaters. It contemplates twenty-eight hydropower generating stations. It includes hundreds of miles of main canals, thousands of miles of laterals and drains, electric transmission and feeder lines and substations, and a vast network of structures for the control and use of water on two million acres of land already irrigated, three million acres of land to be newly irrigated, 360,000 acres in the delta needing protection from intrusions of salt water, and for municipal and miscellaneous purposes.

*Id*. at 433 (quoting *United States v. Gerlach Live Stock Co.*, 339 U.S. 725 (1950). The plaintiff in *Central Green*, an owner of a pistachio orchard, sought damages and injunctive relief against the United States for subsurface flooding and damages to his orchard allegedly caused by part of the federal project running through his property. *Id*. at 427.

Relying on the broad immunity granted by the Flood Control Act, the United States moved to dismiss for lack of subject matter jurisdiction, arguing (as the Corps does here) that it conferred absolute immunity from liability for actions connected with flood control projects. The Ninth Circuit agreed, holding that if a "project has flood control as one of its purposes, and the events giving rise to the action were not wholly unrelated to the project," immunity necessarily attached. *Central Green Co. v. United States*, 177 F.3d 834, 837 (9th Cir. 1999). In so holding, the Ninth Circuit recognized that there would seem to be no "set of facts where the government is not immune from damage arising from water that at one time passed through part

7

of the Central Valley or other flood control project," *id*. at 839, but reasoned that it was bound to the Supreme Court's decision, which suggested that § 702c applied "to all waters contained in or carried through a federal flood control project for purposes of or related to flood control." *James*, 478 U.S. at 605.

The Supreme Court reversed, holding that the scope of immunity conferred by § 702c is not determined "by the character of the federal project or the purposes it serves, but by the character of the waters that cause the relevant damage and the purpose behind their release." *Central Green*, 531 U.S. at 434. In so holding, the Court reasoned that "to characterize every drop of water that flows through that immense project as 'flood water' simply because flood control is among the purposes served by the project unnecessarily dilutes the language of the statute." *Id*.[6] The statute did not say that immunity attached to "any flood control project," but rather any damage from or by floods or flood waters . . . ." *Id*. Accordingly, in determining whether immunity attaches, "courts should consider the character of the waters that cause the relevant damage rather than the relation between that damage and a flood control project." *Id*. at 437. This Court should apply this same reasoning in this case to find that the Corps' policy of abdicating its navigational authority to release water from the non-navigable canals, solely for irrigation purposes does not fall within the scope of Section 1371(a)'s "navigation exception" to CWA liability.

The Corps contends that this case is controlled by the decision of the Court of Claims in In *Mildenberger v. United States*, 91 Fed. Cl. 217 (2010) and *Coastal Petroleum Company v. U.S.*, 207 Ct. Cl. 701 (1976). It asserts that these cases stand for the position that a

---

[6] As the Court recognized, under the government's approach, immunity must attach to all water that flows through the project, even if the water had "never approached flood stage and the terminus of the canal was parched at the end of the summer." *Id*. at 436.

Congressional project purpose that includes navigation as one of several purposes combined with any incidental benefit to navigation provides complete immunity under section 1371(a). Those cases found that the Government's dominant navigation servitude – an extraordinarily robust property interest that overpowers essentially all riparian rights – provides a defense to an uncompensated takings case whenever a project was authorized under the Rivers and Harbors Act or when the conduct giving rise to the takings claim had at least an incidental connection to navigation.  *Mildenberger,* 91 Ct. Cl. at 248-50, *Coastal Petroleum*, 207 Ct. Cl. at 1210.  This court should be guided by the reasoning in *Central Green* concerning immunity rather than takings cases concerning the navigation servitude.

> **D. Although the Eighth Circuit Did Not Address *Central Green*, its Decision in the *Missouri River System Litigation* Cases is Consistent with the Principles of Statutory Interpretation Articulated by the Supreme Court**

The Corps' Motion to Dismiss relies in large part on the Eighth Circuit's decision in *In Re Missouri River System Litigation*, 418 F.3d 915 (8th Cir. 2005).  While that decision does not cite to *Central Green* decision, it is consistent with it.  In *Missouri River,* it was "clear from the face of" the complaint that the alleged water quality violations were caused by Corps' release of water "to support downstream navigation." 418 F.3d at 918.  Plaintiffs alleged that the releases of water for navigation reduced the volume of cold-water habitat in Lake Sakakawea needed to support fisheries, and explicitly sought to enjoin the Corps "from releasing water from Lake Sakakawea to support downstream navigation."  *Id*. at 916.  Thus, it was indisputable that the plaintiffs were attempting to use state water quality standards to enjoin and control the Corps' authority to release water to support and maintain downstream navigation.  Accordingly, the Eighth Circuit concluded that Section 1371(a)(2) immunized the Corps from having to comply with state water pollution rules.  *Id.* at 918.  The purpose of the Corps action at issue was to

support downstream navigation and that purpose entitled it to immunity under Section 1371(a)(2).[7]

In the instant controversy, the Corps' water pollution violations are not caused by water control operations made "to support navigation." That question is one of fact which is addressed below.

### E. The Operation of the Facilities at Issue is Under the Sole Control of the Corps and the Corps is Not Operating These Facilities to Maintain Navigation.

The Corps argues that the *Mildenberger* case resolved factual issues in this case including the question of whether releases of water from the lake are an exercise of its authority to maintain navigation. Corps Memo at 18-19. In *Mildenberger*, the releases at issue were flood waters released down the St. Lucie River. *Mildenberger*, 91 Fed. Cl. at 227 (2010). Because releasing flood waters helps protect the structural integrity of the Herbert Hoover Dike, and because one of the purposes for which the dike was ostensibly constructed was in aid of navigation, flood releases made to preserve the dike were deemed by the court of claims to be in aid of navigation as well. *Id*. at 252. As explained *supra*, the analysis by the court of claims was performed to determine whether the St. Lucie River was impressed with a navigation servitude such that the Corps was immune from a takings claim. Plaintiffs do not dispute that the Lake and the east and west outlet canals (the St. Lucie and the Caloosahatchee Rivers ) are impressed with a navigation servitude. However, this is not a takings case, the navigation servitude is not an issue, and releases of flood waters to lower the lake are not this case's concern. Instead, Plaintiffs assert that the Corps must comply with the Clean Water Act, which, according to the Corps, raises the question of the reach of section 511 of the CWA. 33 U.S.C. 1371. That

---

[7] The *Missouri River* court's sweeping language may have reflected reticence to order compliance with multiple, potentially conflicting state water quality standards along a complex, navigation route that courses through multiple states. 418 F.3d at 919.

requires a factual analysis of the Corps' actions at issue in this case – water releases made for water supply when the lake is low – and that analysis turns on the Corps' 2008 Water Control Plan for Lake Okeechobee.  Because facts show that the Corps is not operating its facilities for the purpose of maintaining navigation, the Corps' motion to dismiss must be denied.

The Central and Southern Florida Project covers 12,000 square miles and involves more than 1000 miles of canals and levees, approximately 250 water control structures, and 17 pumping stations.  Geller at ¶ 3.  Prior to 1948, part of the area now included in the CSFP was included in a project called the Caloosahatchee River and Lake Okeechobee Drainage Areas Project (CR&LODA).

In *Mildenberger,* the court of claims held that the construction of the levee in that project was for navigation.  To set the record straight, the 1930 Caloosahatchee River and Lake Okeechobee Drainage Area Project was not about navigation.  In fact, the Corps had rejected the state's 1927 request for federal involvement in creating a navigable cross state waterway, and agreed only to deepen and straighten an existing navigation channel in the lower part of the Caloosahatchee River that connected to the Gulf of Mexico on the condition the state had to build the rest of the waterway itself.  Exh. 1, pp. 1-6.  The reason the 1930 CR&LODA project was approved was because after the Corps' refusal to enlarge the drainage capacity of the east and west outlets from the Lake (the St. Lucie and Caloosahatchee Rivers), a disastrous hurricane in 1928 destroyed the state constructed muck dike around the lake, Doc. 21-2, p. 14, and killed well over 2000 people.  Doc. 21-2, p. 7; Exh. 2, p. 1. (describing it as "one of the greatest disasters in the history of the Nation").

When forced to address the disaster, the Corps (consistent with its earlier conclusion) found that expenditures of any considerable amount for navigation were not justifiable, but that

Congress could nevertheless approve a substantial contribution "in view of the great disasters" of the past and the valuable land that could be reclaimed by the project. Doc. 21-2, pp. 6-7. The main feature (and most of the cost) was the levee on the south side of the Lake; the "navigation" channel across the lake was simply the levee's borrow canal. Doc. 21-2, p. 4. Under this project, the lake was regulated to maintain lake levels between a low of 12.56 feet and a high of 15.56 feet. Exh. 3, pp. 37-39. The minimum elevation of 12.56 was to maintain the authorized 8 foot deep navigation channel through Lake Okeechobee. Doc. 21-3, pp. 2-3. Exh. 4, pp. 37-38 (describing pre-CSFP regulation of lake levels and explaining lake was maintained above 12.56 at all times).

Responding to yet another flood disaster in 1947, Exh. 2, pp. 1-2, the Corps approved and Congress passed the Flood Control Act of 1948, in which Congress modified and extended the CR&LODA project and turned it into a vast flood control project known officially as the Central and Southern Florida Project for Flood Control and Other Purposes. Exh. 2. Responsibility for, and the nature of the authority over, operation of facilities that are part of this project are set forth in regulations adopted by the Corps for operation of the project:

> The project features to be operated and maintained by the Corps of Engineers are "the levees, channels, locks, and control works of the St. Lucie Canal, Lake Okeechobee, Caloosahatchee River, and the main spillways of the water conservation areas . . ."
> \* \* \* \*
> The local sponsor is responsible for operation and maintenance of all project facilities not operated and maintained by the Corps of Engineers in accordance with regulations approved by the Secretary of the Army.

Exh.4, p. 4-1. The "local sponsor" is the South Fla.Water Management District. Exh. 217, p. 4-1.

The Corps is required to develop Water Control Plans for water management projects owned and operated by the Corps of Engineers including Lake Okeechobee. Exh. 5, p. E-8, Exh. 7. The Corps' plan for Lake Okeechobee is known as the Water Control Plan for Lake

Okeechobee and the Everglades Agricultural Area.  Exh. 6.  The Water Control Plan is a volume of the Corps' Master Water Control Manual: Central and Southern Florida Project for Flood Control and Other Purposes which constitutes the regulations that control the entirety of the project.  *See* Exh. 4, p. 1-1.  Pl. Exh. 6.  Water control plans include lake regulation schedules which are usually expressed in the forms of graphs or tabulations, along with operating criteria, guidelines and specifications for the storage and release functions of the reservoir.  Exh. 5, p. 2.  Over the years, the Corps has adopted a string of Lake Okeechobee regulation schedules which have been altered to deal with evolving water supply demands and operational challenges – such as recent concerns over the integrity of the Herbert Hoover Dike.  Exh. 3, pp. 37-40 (describing changing lake schedules between 1948 and 1975); Exh. 214, p. 2.  The Corps' Water Control Plan for Lake Okeechobee was last revised in 2008 to address the adoption of the newest version of the Lake Okeechobee regulation schedule known as LORS 2008.  Exh. 6, p. 7-8.  Because the Corps attaches to its motion only portions of the final supplemental environmental impact statement which examined the environmental impacts of the various lake regulation schedule alternatives considered by the Corps but not the actual Water Control Plan itself, Plaintiffs attach the Corps' 2008 Water Control Plan for Lake Okeechobee as an exhibit to this response.[8]

The 2008 Lake Regulation Schedule is depicted in Figures 7-1 through 7-4 of the Plan.  The newest schedule divides the lake into three bands, "High Water Management Band," "Operational Band," and Water Shortage Management."  Exh. 6, Fig. 1.  Figure 2 breaks the

---

[8] According to the Supreme Court, "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).  An FSEIS is only a "preliminary, procedural, or intermediate agency action" which is then followed by final agency action.  *Miccosukee Tribe of Indians of Florida v. United State*. 509 F.Supp.2d 1288, 1292 -93 (S.D. Fla. 2007).  Therefore, the operative document is not the FSEIS but the Water Control Plan which the Corps adopted after conducting its environmental review.  In fact, the Corps also failed to attach the new lake regulation schedule which is included as Figures 7-1 through 7-4 in the plan.

"Operational Band" into sub-bands. Exh. 6, Fig. 2. The division between the Base Flow Band and the Beneficial Use Band – the two lowest bands in the Operational Band – is, in general, the 12.56 lake elevation that maintains navigation in the Okeechobee Waterway. The operational criteria in the Plan show that the Corps is not operating the Caloosahatchee River facilities for the purpose of maintaining navigation.

First, although the document states that "the decision making process for Lake Okeechobee water management operations considers all congressionally-authorized purposes," Pl. Exh. 6, pp. 7-8, nothing in the 2008 Plan requires the Corps to maintain navigation in the Okeechobee Waterway. Unlike the original CR&LODA Project, there is no requirement that the lake be maintained at a minimum 12.56 elevation necessary to maintain the authorized 8 foot deep navigation channel in the Okeechobee Waterway. As shown on Pl. Exh. 6, Fig. 7-2, the lake has no "minimum" elevation that must be maintained.

Second, nothing in the 2008 Plan requires the Corps to release water explicitly for the purpose of maintaining navigation. Instead, the Plan states: "Recreation and navigation are provided for when water is available and/or through releases conducted for other project purposes." Exh. 6, p. 7-9. For example, the Plan states that at times when the lake is low and the water is needed for water supply, water supply releases "often provide[] project depths sufficient for navigation." Exh. 6, p. 7-25. However the Corps explicitly acknowledges that the water supply releases[9] it is making "may not be sufficient to maintain navigation depths in the [Okeechobee Waterway]." Exh. 6, p. 7-25. Indeed, the Corps specifically (and without

---

[9] "Water supply" is explained in the Water Control Plan as follows: "a water supply release can be considered a release from Lake Okeechobee to meet water supply demands (for ENP, salinity control, regional groundwater control, agricultural irrigation, municipalities, industry and the environment). Exh. 6, p. 7-9.

restriction) allows outlet canals (one of which is the Caloosahatchee River) to be maintained below optimum water levels in the Water Shortage Management Band. Exh 6, Fig. 7-2, Notes.[10]

Thus, while the Corps claims that, as a matter of fact, it operates its structures to maintain navigation, that claim is belied by the Corps' own Water Control Plan which clearly shows the Corps does not operate its Caloosahatchee River structures for that purpose.

The Corps also claims that setting aside water during low water periods for the purpose of complying with state laws would create reduced stages within Lake Okeechobee and thus impair navigation. However, the Corps' operating criteria explicitly allows reduced stages within the lake without any regard for the impact on navigation – other than to acknowledge that such impacts will occur. Doc. 21-3, pp. 2-3.

For these reasons, Plaintiffs respectfully request that the Court deny the Corps' motion to Dismiss and order the parties to confer on establishing a discovery schedule.

Dated this 21st day of December, 2012

/s/Monica K. Reimer
Monica K. Reimer
Fla. Bar. No. 0090069
mreimer@earthjustice.org
Joshua Smith
Fla. Bar. No. 0096844
111 S. Martin Luther King, Jr. Blvd.
Tallahassee, Florida 32301
(850) 681-0031 (Telephone)
(850) 681-0020 (Facsimile)
*Counsel For Plaintiffs*

---

[10] The Corps attached a copy of this figure without the Notes. Doc. 21, p. 14.

**CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on December 22, 2012, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF. Copies of the foregoing document will be served upon interested counsel either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not yet authorized to electronically receive Notices of Electronic Filing.

                                                                                          /s/ Monica K. Reimer
                                                                                           Attorney