# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 19, 2017

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  14-13392-CC
Case Style:  Florida Wildlife Federation In, et al v. United States Army Corps of En, et al
District Court Docket No:  4:12-cv-00355-RH-CAS

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellants.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Julie F. Cohen, CC at (404) 335-6170.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13392
_____

D.C. Docket No. 4:12-cv-00355-RH-CAS

FLORIDA WILDLIFE FEDERATION INC.,
ENVIRONMENTAL CONFEDERATION
OF SOUTHWEST FLORIDA INC.,
CONSERVANCY OF SOUTHWEST FLORIDA INC.,

Plaintiffs - Appellants
Cross Appellees,

versus

UNITED STATES ARMY CORPS OF
ENGINEERS,
SOUTH FLORIDA WATER MANAGEMENT
DISTRICT,
FLORIDA DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

Defendants - Appellees
Cross Appellants.

_____

Appeals from the United States District Court
for the Northern District of Florida
_____

(June 19, 2017)

Before TJOFLAT and ROSENBAUM, Circuit Judges, and RESTANI,[*] Judge.

ROSENBAUM, Circuit Judge:

With the 1937 opening of Florida's only cross-state water channel, the Okeechobee Waterway (the "Waterway"), boats could reach the Gulf of Mexico from the Atlantic Ocean without going around the southern tip of Florida. Besides saving distance and time, the channel allowed smaller vessels to avoid uncertain sea conditions offshore.

Plaintiff-Appellants Florida Wildlife Federation, Inc., Environmental Confederation of Southwest Florida, Inc., and Conservancy of Southwest Florida, Inc., (collectively, "Conservationists"), complained about serious environmental problems in this channel and the surrounding areas where Lake Okeechobee's waters flow. They asserted that decisions by Defendant-Appellee U.S. Army Corps of Engineers (the "Corps") about when and how to release water from certain locks along the Waterway violate the Clean Water Act and Florida law because they negatively affect the quality of the waters the Corps regulates.

In response, the Corps invoked sovereign immunity, and the district court dismissed the Conservationists' complaint on that basis. The Conservationists now appeal.

---

[*]The Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

2

But they aren't the only ones.  The South Florida Water Management District (the "Water District"), an agency of the State of Florida, also appeals the judgment.  It does so, though, on the basis that the district court first should have decided whether the Conservationists failed to join the Water District as an indispensable party under Federal Rule of Civil Procedure 19(b).

Like a boat navigating the most direct path from the Atlantic to the Gulf of Mexico, we decide this appeal in the most straightforward way available:  Rule 19(b).  In doing so, we decline any invitation by the parties to take a longer, unnecessary route to our decision.  Because Rule 19(b) requires the dismissal of this case regardless of whether we agree with the Water District's sequencing argument on cross-appeal or the Corps's sovereign-immunity argument, we need not reach those matters.  So just as a boat captain in the Waterway has little reason to prepare for rough waters at sea, we put these issues aside and affirm the district court's judgment on the grounds that the Water District was an indispensable party under Rule 19(b).[1]

## I.  Background

To the Conservationists, this case is about the quality of water and the ecological conditions along the Waterway.  To the Corps, it is about federal regulation of navigation through the Waterway.  And to the Florida Department of

---

[1] All pending motions are denied as moot.

Environmental Protection ("DEP") and the Water District, the case is about protecting any authority the state might have over the waters at the center of this controversy.   So resolving this case requires us to consider complex and overlapping interests.  Because understanding these interests is critical to finding the right answer here, we review relevant background information below about Florida's water geography, Florida's water-ecology issues, the roles that the federal and state entities play in regulating the waters at issue in this case, and federal and state law concerning water quality.

A.  Florida's Water Geography

The Waterway is the only navigable cross-Florida water channel.  Heading west from the Atlantic Ocean, the Waterway strings together the St. Lucie Inlet, the Indian River Lagoon, the St. Lucie River, the St. Lucie Canal, Lake Okeechobee, and the Caloosahatchee River to arrive at the Gulf of Mexico.



Okeechobee Waterway

This case primarily concerns the western part of the Waterway along the Caloosahatchee River, from Lake Okeechobee—"considered the heart of the water resources system in south Florida," U.S. Army Corps of Eng'rs, Jacksonville Dist., *Final Supplemental Envtl. Impact Statement, Lake Okeechobee Regulation Schedule* i (2007) ("2007 LORS")—heading west through the Caloosahatchee to the Gulf of Mexico.[2]

Besides their navigational function, the waters composing the Waterway also play many other important roles. They serve as the source of water to thousands of Floridians and are critical both to flood control and to the health of major ecosystems in Florida. The waters also host commercial fishing operations and visitors who enjoy using them for boating, canoeing, swimming, fishing, and wildlife observation.

Five navigation locks control the flow of water along the entirety of the Waterway. The Conservationists' complaint relates to the management of three of these locks. First, the Moore Haven Lock and Spillway, known as "S-77," is closest to Lake Okeechobee and controls flows between Lake Okeechobee and the Caloosahatchee River. Second, 15.5 miles to the west of S-77, on the

---

[2] Lake Okeechobee takes its name from the Muskogee words for "water" ("*okee*") and "big" ("*chobee*"). State Library & Archives of Florida, *Okeechobee*, http://www.floridamemory.com/blog/2013/10/07/okeechobee/ (last visited June 15, 2017). It is the third-largest natural freshwater lake (by surface area) contained entirely within the United States. Encyclopaedia Britannica, *Lake Okeechobee*, https://www.britannica.com/place/Lake-Okeechobee (last visited June 15, 2017).

Caloosahatchee River, lies the Ortona Lock and Spillway, known as "S-78." Third, the W.P. Franklin Lock and Dam, known as "S-79," is located 27.9 miles to the west of S-78 and is the westernmost lock on the Caloosahatchee River.[3] Opening a lock can allow water flow from one section of the Waterway to another, while maintaining a lock in a closed position can prevent water flow between parts of the Waterway.

B.  Florida's Ecological Water Issues

Florida suffers from a Goldilocks problem when it comes to water in the Waterway:  too much or too little results in serious consequences.  The waters in the Waterway are healthiest and most useful when they fall within a range that is just right.  In this lawsuit, the Conservationists complain about only the problems that arise as a result of low water in the Caloosahatchee River, a condition they attribute in part to the Corps's management of S-77, S-78, and S-79 under its 2008 regulation schedule.  *See generally* U.S. Army Corps of Eng'rs, Jacksonville Dist., *Cent. & S. Fla. Project*: *Water Control Plan for Lake Okeechobee & Everglades Agric. Area* (2008) ("2008 LORS").

_____

[3] The last several miles of the Caloosahatchee River, located within the stretch between the Gulf of Mexico and S-79, house the Caloosahatchee Estuary.  An estuary is a body of water that is partially enclosed, along with its surrounding coastal habitats, where fresh water from rivers or streams combines with salt water from the ocean.  *See* National Estuarine Research Reserve System, *Where Rivers Meet the Sea*, https://coast.noaa.gov/data/estuaries/pdf/where-rivers-meet-the-sea-teacher-guide.pdf (last visited June 15, 2017).

Low water levels can have adverse effects on navigation, water supply, and fish and wildlife in the area.  Among other negative effects, low water levels can aggravate ecological conditions in the Caloosahatchee and St. Lucie Estuaries by causing too high a level of salinity and saltwater encroachment into the freshwaters of the Waterway.  But the Conservationists draw special attention to another serious problem associated with lower water levels:  the emergence of algal blooms.  Often characterized by the bright-green appearance of the water in which they are occurring, algal blooms represent a serious environmental problem because they consume an excessive amount of oxygen from the water when the constituent cells die.  The remaining levels of oxygen may be too low to sustain aquatic life, which can die off as a result.

Algal blooms also can result in taste and odor problems with drinking water, contribute to the formation of carcinogenic substances in drinking water when it undergoes chlorination, and produce toxins that are not removed by the treatment process.  Algal-bloom toxins, in turn, can cause liver and neurological disease in animals and humans who drink or come into contact with the water.  They can induce skin irritations, kill fish and other animals, and seriously impair the recreational value of the body of water.  And eating fish taken from waters during algal blooms is dangerous.  Algal blooms have happened in the Caloosahatchee

7

River eight of the eleven years between 2001 and 2012.  In 2011, eight weeks of algal blooms proliferated.

C.  The Federal and State Entities Who Regulate Florida's Water Policy

Management of the Waterway and its constituent waters is essential to protect the health of the waters and to balance the important and sometimes-competing interests in the Waterway.  As we have alluded to, both Florida and the Corps take part in that management.

1.  The History of Florida's Water Management

The State of Florida and the Corps have sought to manage the waters of Lake Okeechobee since the late 1800s, building a complex system of canals, levees, and storage areas to control the lake's water levels.  *See Mildenberger v. United States*, 643 F.3d 938, 941 (Fed. Cir. 2011) (reviewing the history of the Central & South Florida Project).  Following hurricanes in 1926 and 1928 that resulted in flooding, damage, and many deaths, Congress enacted the Rivers and Harbors Act of 1930, authorizing the Chief of Engineers of the United States Army, under the supervision of the Secretary of War (now Secretary of the Army), to provide for flood control and navigation in Florida as well as elsewhere.  Rivers and Harbors Act of 1930, Pub. L. No. 71-520, 46 Stat. 918 (1930).

In accordance with this Act, Congress directed the creation of a project for navigation and flood control in the Caloosahatchee-Lake Okeechobee areas.  *See* S.

8

Doc. No. 115, 71st Cong., 2d Sess., at A-6 (1930) (Letter dated Mar. 15, 1930 from Lytle Brown, Major General, Chief of Engineers, United States Army, to Hiram W. Johnson, Chairman Committee on Commerce, U.S. Senate).  More specifically, Congress acted on the Chief of Engineers's recommendation to deem "the St. Lucie Canal, the Caloosahatchee Canal, and other channels forming the proposed cross-State waterway . . . navigable waters of the United States and subject to the Federal laws for the protection of such waterways." *Id*. at A-7.

In 1948, Congress authorized the Army Corps of Engineers to preside over the Central & South Florida Project (the "Project") "for the benefit of navigation and the control of destructive floodwaters and other purposes."  Flood Control Act of 1948, Pub. L. No. 80-858, 62 Stat. 1175 (1948).  The Project spans 12,000 square miles and includes the Okeechobee Waterway.

Although the Corps bears management and operational responsibility for the Project, the Water District—the Project's "local sponsor"—maintains and operates many of the structures within the Project.  But the Water District does not maintain and operate the "levees, channels, locks, and control works of the St. Lucie Canal, Lake Okeechobee, Caloosahatchee River, and the main spillways of the water conservation areas."  U.S. Army Corps of Eng'rs, Jacksonville Dist., *Master Water Control Manual, Cent. & S. Fla. Project for Flood Control & Other Purposes: Auths. & Responsibilities* 4-1 (1991).  Those remain under the control of the Corps.

9

Rather, as the Water District has described its role in the Project, "the agency interacts with the [Corps] on Lake Okeechobee operations within the confines of the federally adopted lake regulation schedule."  South Florida Water Management District, *Final Adaptive Protocols for Lake Okeechobee Operations* iii (2010).  The Water District further acknowledges that federal law requires local sponsors to "maintain and operate all works after completion in accordance with regulations prescribed by the Secretary of War [Army]."  *Id.* at 7 (alteration in original) (quoting 33 U.S.C. § 701c).

Federal law demands that excepted areas and water-control structures— which include the S-77, S-78, and S-79 water-control structures—be operated and maintained in accordance with regulations approved by the Secretary of the Army. 33 C.F.R. § 208.10(a)(2).  Congress intended the Corps's control over these areas and structures to "serve[] a number of competing functions, including flood control, water supply, navigation, environmental protection and enhancement, and recreational purposes."  U.S. Army Corps of Eng'rs, Jacksonville Dist., *Lake Okeechobee Regulation Schedule Study, Final Envtl. Impact Statement and Annex A* i (1999).

To "conform with objectives and specific provisions of authorizing legislation and applicable Corps of Engineers reports," the Corps manages Lake Okeechobee's water levels in accordance with a regulation schedule.  U.S. Army

Corps of Eng'rs, *Engineer Reg. 1110-2-240, Engineering and Design, Water Control Mgmt., Distribution Restriction Statement* 2 (1982).  The Corps develops water-control plans for each specific project and revises them as necessary, "provided such revisions comply with existing Federal regulations and established Corps of Engineers policy." *Id*.

### 2.  *The 2008 LORS*

The most recent water-control plan for the Project, the 2008 LORS, was a response to the heavy levels of rain Florida experienced in 2003-2005.  *See* 2007 LORS at ii.  The 2008 LORS represents an effort to more effectively address Lake Okeechobee's high-water problems of the prior few years through a water-release "decision-making process that considers all the Congressionally-authorized project purposes."  2008 LORS at 7-1.[4]  Under the 2008 LORS, the "authorized project purposes" include "flood control; navigation; water supply for agricultural irrigation, municipalities and industry, the Everglades National Park . . . , regional groundwater control, and salinity control." *Id.*

Because the Corps must consider certain constraints on the water-control plan that are "interrelated and . . . [may involve] physical, legal, political, social and major conflicts between authorized project purposes," the 2008 LORS does

---

[4] The page numbering of the 2008 LORS contains two numbers:  the first represents the larger section, and the second is the page number within the larger section.

not emphasize one project purpose over the others.  *Id*.  Instead, every water-release decision affecting Lake Okeechobee incorporates all project purposes.

Under the 2008 LORS, decision frameworks known as "management bands" guide the Corps's water-control decisions relating to Lake Okeechobee.  *Id.* at 7-10.  Each management band provides water-release guidance corresponding with a particular level of water in Lake Okeechobee.  The 2008 LORS establishes three broad management bands:  the High Lake Management Band, the Operational Band, and the Water Shortage Management Band.

Unlike for the other bands, the 2008 LORS explains that "[t]he goal of [the Water Shortage Management Band] is to manage existing water supplies contained within Lake Okeechobee in accordance with [Water District] rules and guidance."  *Id.* at 7-24.  Towards this end, the 2008 LORS provides that water releases for certain statutorily approved beneficial uses of Lake Okeechobee—including, among others, estuarine management and salinity control and dilution of pollutants in project canals—"may be restricted at the discretion of the [Water District] as outlined in the Water Shortage Management Band."  *Id.*

As this provision affects navigation, the 2008 LORS explains that the Water District "typically requests that the Corps implement reduced hours of lockages . . . .  During reduced hours of lockages, water is conserved and saltwater migration upstream of S-79 is potentially reduced."  *Id.* at 7-25.  But the 2008 LORS

12

cautions, "[i]t is important to note that the [Water District] request for weekly allocation volume water supply deliveries may not be sufficient to maintain navigation depths in the [Waterway]."   *Id.*   Based on this circumstance, the Conservationists contend that when the Water Shortage Management Band is in effect, as a practical matter, the Corps's authority to maintain navigation cannot be a consideration in water-management decisions because navigation is often not possible.

## D.  Laws Governing Administration of the Relevant Bodies of Water

### *1.  The Relevant Florida Statutes*

#### a.  The Air and Water Pollution Control Act

Florida enacted the Air and Water Pollution Control Act in part to improve and protect the quality of Florida waters.   *See* Fla. Stat. § 403.021(2).   In furtherance of this goal, Florida empowered the DEP to promulgate necessary rules and regulations to implement the Air and Water Pollution Control Act.   *Id.* § 403.061.   Among the rules that the DEP created, Florida Administrative Code Rule 62-302.200, *et seq*. ("Florida Water Regulations"), comprehensively provides for the prevention, abatement, and control of pollution in the state's navigable waters.

The Florida Water Regulations set forth guidelines such as the following for bodies of water like the Caloosahatchee River:  minimum permissible levels of

dissolved oxygen, *see* Fla. Admin. Code R. 62-302.530(58); limitations on the concentration of dissolved solids, Fla. Admin. Code R. 62-302.530(59); prohibitions on "[s]ubstances in concentrations which injure, are chronically toxic to, or produce adverse physiological or behavioral response in humans, plants, or animals," Fla. Admin. Code R. 62-302.530(108); and maximum average salinity concentrations, Fla. Admin. Code R. 40E-8.221. The Conservationists assert that the Corps's water-management decisions when the Water Shortage Management Band is in effect create water conditions that violate the Florida Water Regulations.

### b. The Florida Water Resources Act

Florida originally passed its Water Resources Act in 1972. *See* Fla. Stat. § 373.013. Under the statute, private citizens have a cause of action to enjoin the operation of any stormwater facility that violates Florida law. But the Florida Water Resources Act also provides that "[t]he governing board or the [DEP] shall be a necessary party to any such suit." Fla. Stat. § 373.433.[5]

---

[5] The statute reads,

> Any stormwater management system, dam, impoundment, reservoir, appurtenant work, or works which violates the laws of this state or which violates the standards of the governing board or the [DEP] shall be declared a public nuisance. The operation of such stormwater management system, dam, impoundment, reservoir, appurtenant work, or works may be enjoined by suit by the state or any of its agencies or by a private citizen. The governing board or the [DEP] shall be a necessary party to any such suit.

Fla. Stat. § 373.433. The Florida Statutes do not define the meaning of the term "necessary party."

*2. The Clean Water Act*

Congress enacted the Clean Water Act, 33 U.S.C. § 1251, *et seq.*, to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Towards this end, among other functions, the Clean Water Act regulates pollution control at federal facilities. *See id.* § 1323. In relevant part, it requires each agency with jurisdiction over a property or facility to be "subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity." *Id.* § 1323(a). The statute exempts federal agencies, however, from any state law or regulation "affecting or impairing the authority of the Secretary of the Army . . . to maintain navigation." *Id.* § 1371(a).

## II.  Procedural History

The Conservationists filed suit against the Corps under the Clean Water Act. They sought declaratory and injunctive relief in the form of a judgment declaring that the Corps's operation of S-77, S-78, and S-79 failed to comply with the Florida Water Regulations and the Florida Water Resources Act, and an injunction prohibiting the Corps from operating the structures in a manner that violates Florida law. More specifically, the Conservationists asserted that the Corps's decisions to hold S-77, S-78, and S-79 closed when water is low causes violations

15

of Florida's water-quality standards for dissolved solids and dissolved oxygen in the Caloosahatchee River, regulations of salinity and minimum water flows and levels, and regulations prohibiting concentrations of injurious and chronically toxic substances in the water. The Conservationists also complained that the Corps's operation of S-77, S-78, and S-79 interferes with the river's designated uses for drinking-water supply, for recreation, and for propagation of fish and wildlife.

In response, the Corps moved to dismiss the complaint on the basis of sovereign immunity, relying on § 1371(a)'s caveat that the Clean Water Act "shall not be construed" as imposing liability where the allegedly prohibited conduct "affect[s] or impair[s] the authority" of the federal government to "maintain navigation." 33 U.S.C. § 1371(a). Independently of the Corps, the DEP and the Water District moved to dismiss the complaint, invoking Eleventh Amendment sovereign immunity.[6] In turn, the Conservationists voluntarily dismissed the Water District and the DEP.

Despite the Conservationists' voluntary dismissal of the state parties, the Water District then filed a motion for limited intervention in an effort to dismiss the entire case against all parties, relying on Federal Rule of Civil Procedure 19(b) and the Eleventh Amendment. The Water District's argument had two parts. First,

---

[6] Although the Conservationists articulated no claim and sought no relief against any state actors, they included the DEP and the Water District as "necessary part[ies]" to the action under the Florida Water Resources Act.

the Water District contended that, even without considering the requirement under Florida law that the "governing board or the department shall be a necessary party," the Water District was still a "required" party under Federal Rule of Civil Procedure 19(a), meaning that it should be joined if possible based on its role in the Project.

Second, the Water District asserted that, if it was a "required" party here, then it was also an "indispensable" party under Federal Rule of Civil Procedure 19(b) as a result of its significant regulatory interests and responsibility over various aspects of the Project.  In the Water District's view, because it was both indispensable under Rule 19(b) and immune from suit on the basis of its Eleventh Amendment immunity, the lawsuit had to be dismissed against all parties without reaching the issue of whether sovereign immunity protected the Corps's water-control decisions.

So, in a nutshell, the Conservationists asserted that the Corps is liable under the Clean Water Act for violating the Florida Water Regulations because the Florida Water Resources Act provides a cause of action against any stormwater facility that violates Florida law.  And the Corps responded by claiming sovereign immunity under § 1371(a) of the Clean Water Act based on the role navigation plays in its management decisions.  But since the Conservationists relied in part on the Florida Water Resources Act to allege a violation of the Clean Water Act, the

Water District contended that the litigation—including resolution of the Corps's claim of sovereign immunity—could not proceed without it.  And because the State invoked sovereign immunity, the Water District reasoned, the district court was required to dismiss the case without first considering the Corps's claim of sovereign immunity.

The district court granted the Conservationists' motion to dismiss without prejudice the Water District and the DEP[7] and denied the Water District's motion for limited intervention.  As the court explained its ruling, the court declined to allow the Water District to intervene without waiving its Eleventh Amendment immunity.  Nevertheless, the court did allow the Water District to participate in the case as amicus curiae to present the arguments it wished.  The order specifically preserved and did not rule on whether the case could proceed without the Water District as a party.

On May 26, 2014, after further proceedings before both the district court and this Court relating to these motions and others,[8] the district court dismissed the

---

[7] Although the district court acknowledged the Conservationists had already sought to voluntarily dismiss the state parties by filing a notice of dismissal, the court made the dismissal official without deciding whether a notice of voluntary dismissal could suffice to dismiss a party in the absence of an amended complaint.

[8] Below is a brief explanation of the proceedings that occurred between the district court's dismissal of the Water District as a party on December 21, 2012, and the district court's operative Order dismissing the case on May 26, 2014:

Conservationists' complaint under Federal Rule of Civil Procedure 12(b)(1) on the grounds that § 1371(a) of the Clean Water Act preserves the Corps's sovereign immunity from suit when, as the district court concluded applied in this case, the Corps's authority to maintain navigation is at issue.  Finding that granting the Corps's motion resolved the case in its entirety, the district court ruled that the Water District's motion to intervene was moot.

In an alternative ruling, the district court determined that, under § 373.433 of the Florida Statutes, the case could not proceed without the Water District or the DEP.  In light of this alternative ruling, the district court expressly found it "unnecessary to decide whether . . . the [Water] District would be [an "indispensable" party] without whom the case could not go forward" under Rule 19(b).  In effect, the district court declined to grant the Water District's request to

---

On January 4, 2013, the Water District moved for reconsideration of the December 21, 2012, order denying the Water District's motion to intervene.  Although the district court heard oral argument on the Water District's motion for reconsideration, before the district court could issue a ruling, the Water District filed a notice of appeal of the district court's December 21, 2012, order.

While the Water District's appeal from the December 21 order was pending before this Court, the district court entered an order on September 27, 2013, indicating its intent to dismiss the case as a whole upon resolution of, or remand from, the pending appeal.  The September 2013 order stayed district-court proceedings pending resolution of the appeal of the December 21 order or remand for entry of a dismissal order, and it directed the parties to notify the clerk of this Court concerning the entry of the court's indicative rulings.

On October 25, 2013, the Water District filed in this Court a motion to retain jurisdiction and opposition to remand, contesting the indicative rulings that the district court entered.  We dismissed the Water District's appeal for lack of jurisdiction, and we denied all pending motions as moot.  On remand, the district court filed its May 26, 2014, order dismissing the case.  It is that order from which the Conservationists and the State each appeal.

consider first (before evaluating the Corps's sovereign-immunity argument) the Water District's procedural argument under Federal Rule of Civil Procedure 19(b). And, in fact, the district court chose not to rule at all on the Water District's Rule 19(b) argument.

The Conservationists appealed the district court's order dismissing the case based on the Corps's sovereign immunity.  Meanwhile, the Water District cross-appealed, challenging the district court's decision not to address, as a threshold matter, the Water District's argument that the litigation must be dismissed under Rule 19(b).

## III.  Discussion

We may affirm the district court's ruling on any basis the record supports. *Haynes v. McCalla Raymer, LLC*, 793 F.3d 1246, 1249 (11th Cir. 2015).  We may do so "regardless of the grounds addressed, adopted or rejected by the district court." *Bonanni Ship Supply, Inc. v. United States*, 959 F.2d 1558, 1561 (11th Cir. 1992).  After careful review, we affirm the judgment of the district court on the basis that the Water District was an indispensable party under Rule 19(b).

Rule 19, Fed. R. Civ. P., governs the required joinder of parties to an action. Rule 19(a) lays out the standards for determining whether a party is "required" by virtue of its interest in or importance to the action, and Rule 19(b) provides factors

for a court to consider in determining whether, "in equity and good conscience," the action may proceed when a required party cannot be joined:

> Rule 19 states a two-part test for determining whether a party is indispensable. First, the court must ascertain under the standards of Rule 19(a) whether the person in question is one who should be joined if feasible. If the person should be joined but cannot be (because, for example, joinder would divest the court of jurisdiction) then the court must inquire whether, applying the factors enumerated in Rule 19(b), the litigation may continue.

*Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1279–80 (11th Cir. 2003) (internal quotation marks omitted); *see* Fed. R. Civ. P. 19.

Here, the Water District contends that it cannot be joined because it invokes its sovereign immunity. So the questions we must answer under Rule 19 include the following: (1) is the Water District a required party under Rule 19(a)? And (2) if so, under Rule 19(b), "in equity and good conscience," should the litigation proceed in the Water District's absence?

We begin with Rule 19(a), which provides that a party is required if "that [party] claims an interest relating to the subject of the action and is so situated that disposing of the action in the [party's] absence may . . . as a practical matter impair or impede the [party's] ability to protect the interest." Fed. R. Civ. P. 19(a). We have held that "pragmatic concerns, especially the effect on the parties and the litigation, control" this analysis. *Focus on the Family*, 344 F.3d at 1280 (internal quotation marks omitted).

In its motion to dismiss, the Water District claimed a strong interest in the outcome of the litigation in this case, and it argued that that interest would be inadequately protected in the Water District's absence.  We agree.  As we reviewed above, the Water District is involved in an integral way in the Corps's management of the Project.  The Water District is the local sponsor for the Project.  So it maintains and operates many of the Project's structures.

Indeed, under the 2008 LORS, when the Water Shortage Management Band is in effect, the Corps defers to the Water District's discretion to restrict water releases.  So any injunction against the Corps as it relates to water-release decisions in the Water Shortage Management Band could, as a practical matter, potentially affect the Water District's discretion.

Plus, the Corps and the Water District must cooperate closely whenever tension may arise between the Corps's navigation goals and the Water District's conservation, water-quality, and other goals under the Water Shortage Management Band.  So any adjudication of the Corps's liability or the scope of its authority has the potential to carve a jagged line through the cooperative arrangements that the Corps and the Water District use to implement the Project.

And the Conservationists are not in any position to safeguard the Water District's interests in the litigation.  Although the Conservationists and the Water District share a general goal of protecting water quality, their interests are not the

same.  Nor can the Conservationists speak to how judicial intervention would affect the Water District's working relationship with the Corps or the Water District's ability to discharge all its duties—not just those relating to the litigation—under the Project and Florida law.  For all these reasons, we conclude that the Water District is a required party under Rule 19(a).

We turn now to the second question—whether the action should be dismissed "in equity and good conscience" for lack of the Water District's involvement.  *See* Fed. R. Civ. P. 19(b).  That is, we ask whether the Water District is a party traditionally labeled "indispensable" under the common law.  *See Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 119 (1968) ("[A] court does not know whether a particular person is 'indispensable' until it ha[s] examined the situation to determine whether it can proceed without him."); *see generally* 7 Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, A. Benjamin Spencer & Adam N. Steinman, *Federal Practice & Procedure: Federal Rules of Civil Procedure* § 1601 (3d ed. 2016) (reviewing the incorporation of the doctrine into federal law).

Rule 19(b) sets out four factors for us to consider:

> (1) the extent to which a judgment rendered in [the Water District's] absence might prejudice [the Water District] or the other parties; (2) 'the extent to which any prejudice could be lessened or avoided by' 'protective provisions in the judgment,' 'shaping the relief,' or 'other measures'; (3) whether a judgment rendered in [the

> Water District's] absence would be adequate; and (4)
> whether [the Conservationists] would have an adequate
> remedy if we dismissed the entire case.

*Thermoset Corp. v. Bldg. Materials Corp. of Am.*, 849 F.3d 1313, 1319 (11th Cir. 2017) (quoting Fed. R. Civ. P. 19(b)).  Accounting for these factors, we explain below why the Water District qualifies as an indispensable party.

First, the Water District's interests would be greatly prejudiced by an action proceeding in its absence.  Beyond those practical concerns we have already discussed that might arise from judicial intervention into the Water District's relationship with the Corps, we must give strong consideration to the Water District's interest in this case because the Water District is a sovereign entity to which we owe comity.

In Rule 19(b) cases where a required party asserts sovereign immunity, the Supreme Court has instructed us to give "[]sufficient weight to [the party's] sovereign status" out of recognition that any consideration of the merits in the sovereign's absence is "itself an infringement on . . . sovereign immunity." *Republic of Philippines v. Pimentel*, 553 U.S. 851, 864–65 (2008).[9]  Taking our

---

[9] The sovereign in question in *Pimentel* was foreign, and the Court noted that foreign sovereign immunity in particular "is premised upon the perfect equality and absolute independence of sovereigns," *Pimentel*, 553 U.S. at 865 (internal quotation marks omitted), but the Court's reasoning regarding the application of Rule 19(b) appears just as applicable to the context of domestic federal-state relationships insofar as immunity from private suit is concerned.  *Compare id.* at 866 ("[F]oreign sovereign immunity derives from standards of public morality, fair dealing, reciprocal self-interest, and respect for the power and dignity of the foreign sovereign.") (internal quotation marks omitted), *with Alden v. Maine*, 527 U.S. 706, 714

cue from the way in which the Supreme Court has applied this concept, we have no choice but to conclude that the Water District is, in fact, "indispensable" to this litigation.

*Pimentel* involved an interpleader action to divide assets of Ferdinand Marco, the former president of the Republic of the Philippines, payable as damages to certain victims of his human-rights abuses, but to which other parties— including state parties—had made claims. *See id.* at 857–59. The Court detailed some of the considerations militating against allowing the interpleader action to proceed in U.S. federal court without the Philippines state parties as defendants: the damages owed to the human-rights victims had been awarded on the basis of "events of historical and political significance" to the Philippines and its people; the Philippines had an assumed comity interest in using its own courts to decide the dispute; and it would be an affront for one state to seize another's property even if by judicial means. *See id.* at 866.

Here, adjudication of the Conservationists' complaint without the Water District's involvement would be an affront to Florida's sovereignty for similar

---

(1999) ("The federal system established by our Constitution preserves the sovereign status of the States . . . . [I]t reserves to them a substantial portion of the Nation's primary sovereignty, together with the dignity and essential attributes inhering in that status."). If anything, state sovereign immunity presents a more compelling case under Rule 19(b), as it "is a *constitutional* doctrine that is meant to be both immutable by Congress and resistant to trends," which is not the case with foreign sovereign immunity. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686 n.4 (1999) (emphasis in original).

reasons, even though the Water District and the Corps possess overlapping jurisdiction over Florida's water resources.   Because of the way the Conservationists have framed the Corps's alleged transgressions—as violations of the Clean Water Act only because they violate Florida Water Regulations and Florida's Water Resources Act—this case is fundamentally about Florida's protection of its own natural resources.

And notably, the relevant Clean Water Act provision expressly incorporates *all* state pollution-control rules, no matter whether procedural or substantive.  *See* 33 U.S.C. § 1323(a).   In this case, although we need not discern the precise meaning of the phrase "necessary party" in the Water Resources Act, Fla. Stat. § 373.433,[10] the plain import of the language—which is incorporated into the federal cause of action under § 1323(a)—is to ensure adequate representation and protection of Florida's interests in any action under the Florida Act.   Proceeding without the Water District, then, would not only prejudice the State's interests in the ways we have identified but also run counter to the State's express intention under the Water Resources Act to be involved in any action relying on its own statute.   In sum, this first factor under Rule 19(b) weighs heavily in favor of dismissal.

---

[10] Case law regarding the proper application of Rule 19(b) is dispositive in this case regardless of the meaning of this phrase in the Florida statute.  We would be the first court, state or federal, to define the scope of the phrase, and we see no need to attempt to do so here.

Second, because of the nature of the Water District's interests in the case, we can discern no way in which prejudice could be avoided by means other than joinder. As we have discussed, any relief in this case would take the form of an injunction with potentially substantial consequences for the Water District's management of the Waterway. Regardless of whether the Water District might find a court order simple to follow, no protective measures could mitigate the Water District's lack of discretion in pursuing its own management strategy. This second factor also weighs in favor of dismissal.

Third, the adequacy of the judgment would suffer without the Water District's involvement. True, the Water District could not be held liable in a formal sense were it a party, so it is not meaningful to ask whether the Water District would be bound by a judgment in favor of the Conservationists. But adequacy refers to more than just the enforceability of a judgment against particular parties; it refers to "the public stake in settling disputes by wholes, whenever possible." *See Pimentel*, 553 U.S. at 870 (internal quotation marks omitted). And deciding this case without the Water District would not result in that outcome. To the extent that the Corps takes the position that the Water District enjoys discretion to restrict water flows in the Water Shortage Management Band only because the Corps has chosen to defer to the Water District in that circumstance, any injunction against the Corps would not end the

litigation but instead could set up a battle between the Corps and the Water District over who has the ultimate authority for making water-release decisions. If it's the Corps, an injunction against the Corps would eliminate the Corps's ability to choose to defer to the Water District, which, in turn, would end the Water District's discretion to restrict releases. But if it's the Water District, an injunction against the Corps would have no effect on the Water District's authority to exercise its water-release discretion.

This public interest surpasses the private interests of potential parties because it also includes "considerations of efficiency" that counsel in favor of limiting the expenditure of public resources to one proceeding, rather than multiple ones, to resolve the same controversy. *See Provident Tradesmens Bank*, 390 U.S. at 111. Here, the Conservationists ultimately seek to effect change in the way decisions are made about water control in the Waterway. Leaving out a major player that bears responsibility for making and implementing such decisions would deprive the process of its adequacy towards that end. So this factor also weighs in favor of dismissal.

Fourth, even if dismissal of this action will preclude an alternative remedy for the Conservationists,[11] this factor's weight in favor of proceeding with

_____

[11] It is not clear that the Conservationists have no other remedy available. For example, it would appear that the Conservationists could seek a remedy under the Administrative Procedure Act, 5 U.S.C. § 501, *et seq.* ("APA"), given the nature of their challenge to the LORS regulations

litigation cannot, in the circumstances of this case, overcome the weight of the other three to the contrary, in light of *Pimentel*. The Supreme Court has already told us as much in materially indistinguishable circumstances: "Any prejudice to [the Conservationists] in this regard is outweighed by prejudice to the absent entities invoking sovereign immunity. Dismissal under Rule 19(b) will mean, in some instances, that plaintiffs will be left without a forum for definitive resolution of their claims." *Pimentel*, 553 U.S. at 872. Indeed, the *Pimentel* Court's sovereign-immunity analysis leaves little room for any other conclusion here:

> A case may not proceed when a required-entity sovereign is not amenable to suit. . . . [W]here sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign.

*Pimentel*, 553 U.S. at 867.

That describes the case in this proceeding. The Water District is entitled to and has invoked sovereign immunity, and we cannot ignore that it could suffer significant cognizable injury to its interests if the litigation here proceeds without it. We can appreciate the district court's equitable concern that "[t]he [Water] District cannot eat its cake and have it, too. . . . The [Water] District can come aboard or not as it chooses, but it cannot have it both ways." But we think

---

and the United States's broad waiver of immunity under the APA. *See, e.g., Golden Pac. Bancorp v. Clarke*, 837 F.2d 509, 512 (D.C. Cir. 1988).

*Pimentel* requires us, at least in this situation, to reach the opposite conclusion. Because the Water District is an indispensable but absent sovereign, the action must be dismissed under Rule 19(b).

We conclude our discussion by expressly declining to rule on the Water District's argument about improper sequencing of the district court's rulings. The Rule 19(b) analysis fully disposes of the case, regardless. Even if the district court erred in ruling on the Corps's sovereign-immunity argument first,[12] we are nonetheless under no obligation to address the issue on appeal. The principle that we may decline to decide any issues unnecessary to resolving an appeal is a firm one, "even if the district court did not apply the proper standard" in addressing an issue we choose not to consider. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293 n.3 (11th Cir. 2010).

## IV.  Conclusion

For these reasons, we affirm the district court's dismissal of the Conservationists' action.

**AFFIRMED.**

---

[12] To be clear, we express no view on this issue.

30

TJOFLAT, Circuit Judge, specially concurring:

I concur with the Court's conclusion that the Water District is an absent but indispensable party under Rule 19(b).  I write separately to address the alternative ground on which the District Court dismissed the Conservationists' suit:  the Corps's asserted immunity from suit under the navigation-maintenance exception.  I take no position on the scope of that immunity because, for the reasons that follow, I believe it was legal error for the District Court to enter its broader-than-necessary immunity holding when the straightforward analysis required by Rule 19(b) and respect for the Water District's sovereign interests called for earlier termination of the proceedings.  Although district courts are indeed given discretion to choose between multiple nonmerits grounds independently warranting dismissal—that is, the district courts can choose how to "sequence" their rulings on threshold grounds to best dispose of a case—this discretion is not unbounded.  And this case, with its strange and convoluted procedural posture, is the exceedingly rare case in which that discretion was exceeded by declining to rule on a nonjurisdictional ground (the Water District's Rule 19(b) failure-to-join ground) in favor of a jurisdictional basis (the Corps's Rule 12(b)(1) sovereign-immunity ground).

I.

The Supreme Court has addressed the federal courts' discretion to choose

between available nonmerits grounds for dismissal on three occasions since 1998

in the so-called "jurisdictional-sequencing trilogy" of *Steel Co. v. Citizens for*

*Better Environment*, 523 U.S. 83, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998),

*Ruhrgas AG v. Marathon Oil Company*, 526 U.S. 574, 119 S. Ct. 1563, 143 L. Ed.

2d 760 (1999), and *Sinochem International Co. Ltd. v. Malaysia International*

*Shipping Corp.*, 549 U.S. 422, 127 S. Ct. 1184, 167 L. Ed. 2d 15 (2007).  *See*

*generally* Alan M. Trammell, *Jurisdictional Sequencing*, 47 Ga. L. Rev. 1099,

1105–10 (2013).  Admittedly courts faced with these issues have, to varying

degrees, "struggled to apply" the lessons of the jurisdictional-sequencing trilogy,

which has been seen as having created something of "a moving target for lower

courts."  *See id.* at 1110, 1111–16; *see also* Scott C. Idleman, *The Emergence of*

*Jurisdictional Resequencing in the Federal Courts*, 87 Cornell L. Rev. 1, 4 (2001)

("To date, the lower federal courts have expressed both uncertainty and

disagreement over the proper interpretation of the resequencing doctrine, and given

its recent vintage, there has been only limited academic commentary on either its

validity or its implications.").  Nevertheless, careful examination of the reasoning

underlying the Supreme Court's sequencing decisions with an eye toward the

interests at stake in this litigation resolves the issue here.  And to the extent line-

drawing questions remain about the precise scope of district courts' discretion to sequence threshold determinations, the task of answering those questions is left for future cases that may not be so easily resolved.

In *Steel Co.*, the Supreme Court rejected the false, though widely embraced, doctrine of "hypothetical jurisdiction," whereby courts would bypass any inquiry into the existence of their subject-matter jurisdiction to rule on more easily resolved merits grounds. The Court rejected that doctrine, explaining that courts' invoking it to reach the merits "comes to the same thing as an advisory opinion" because "[h]ypothetical jurisdiction produces nothing more than a hypothetical judgment." *Steel Co.*, 523 U.S. at 101, 118 S. Ct. at 1016 (citing *Hayburn's Case*, 2 U.S. 408, 2 Dall. 409, 1 L. Ed. 436 (1792)). Though the Court recognized that its own precedent "must be acknowledged to have diluted the absolute purity of the rule that Article III jurisdiction is always an antecedent question," the Court also emphasized that "[m]uch more than legal niceties are at stake" because the "statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers" struck between the three branches of the Federal Government. *Id.* at 101, 118 S. Ct. at 1016. "For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires." *Id.* at 101–02, 118 S. Ct. at 1016.

33

In *Ruhrgas*, the Court qualified the scope of its ruling in *Steel Co.* to make clear that, though federal courts lack the authority to make merits determinations before their jurisdiction has been established, those courts need not first decide whether they have subject-matter jurisdiction over a proceeding that should be dismissed on other jurisdictional grounds.  The messy procedural history of the litigation in *Ruhrgas* involved a consortium of European buyers who entered into an agreement with Marathon Oil Company and several of its subsidiaries and affiliates for certain gas-licensing rights in the Heimdal Field of the Norwegian North Sea.  526 U.S. at 578–79, 119 S. Ct. at 1567.  When that agreement soured, the Marathon Oil plaintiffs filed suit in Texas state court, asserting various state-law claims for fraud, tortious interference with prospective business relations, breach of fiduciary duty, and civil conspiracy.  *Id.* at 579, 119 S. Ct. 1567–68.  The European defendants removed the case to federal court, asserting three bases for federal subject-matter jurisdiction:  (1) there would be diversity jurisdiction under 28 U.S.C. § 1332 if one of the plaintiffs, Marathon Oil's Norwegian subsidiary, were to be stricken as fraudulently joined; (2) there was federal-question jurisdiction under 28 U.S.C. § 1331 based in federal common law; and (3) there was jurisdiction under 9 U.S.C. § 205, which governs international arbitration agreements.  *See id.* at 579–80, 119 S. Ct. at 1568.  After the case had been removed, the European defendants then moved to have the case dismissed for lack

of personal jurisdiction on the theory that they had insufficient contacts to the State of Texas while the Marathon plaintiffs moved to have the case remanded to state court because the case lacked federal subject-matter jurisdiction. *Id.* at 580–81, 119 S. Ct. at 1568.

The Supreme Court in *Ruhrgas* thus faced the question of whether the district court to which the case had been removed must rule first on the issue of its subject-matter jurisdiction, or whether it could instead choose to rule first on the existence of personal jurisdiction. The Court decided the latter. Based on principles of federalism and judicial economy, the Court held that it is not an abuse of discretion for a district court to resolve "a straightforward personal jurisdiction issue presenting no complex question of state law" when the alternative is to first rule on an "alleged defect in subject-matter jurisdiction rais[ing] a difficult and novel question" that may have preclusive effect if the proceedings were to be remanded to state court. *Id.* at 587–88, 119 S. Ct. at 1572. While the Court explained that subject-matter jurisdiction should generally be resolved first because "in most instances" doing so "will involve no arduous inquiry" and the same concerns of "expedition and sensitivity to state courts' coequal stature should impel the federal court to dispose of that issue first," the Court declined to impose a bright-line rule to that effect. *Id.* Although the "character of the two jurisdictional bedrocks" of subject-matter and personal jurisdiction

35

"unquestionably differs"—because "[s]ubject-matter limitations on federal jurisdiction serve institutional interests" under Article III, whereas personal jurisdiction "'represents a restriction on judicial power . . . as a matter of individual liberty'" in line with principles of due process—"[t]hese distinctions do not mean that subject-matter jurisdiction is ever and always the more 'fundamental.'"  *Id.* at 583–84, 119 S. Ct. at 1570 (citing *Steel Co.*, 523 U.S. at 94–95, 118 S. Ct. at 1012, and *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S. Ct. 2099, 2104, 72 L. Ed. 2d 492 (1982)).  In short, the Court held that "there is no unyielding jurisdictional hierarchy" and there "are circumstances in which a district court appropriately accords priority to" another threshold determination before reaching the existence of its subject-matter jurisdiction.  *Id.* at 578, 119 S. Ct. at 1567.

The final chapter in the Supreme Court's jurisdictional-sequencing trilogy further clarified courts' discretion to choose between threshold grounds for dismissal.  The Court's decision in *Sinochem* confirmed that, in appropriate circumstances, a district court may dispose of a case on any proper nonmerits ground—including nonjurisdictional grounds—before establishing its subject-matter jurisdiction.  That is, district courts may at times rule on discretionary doctrines warranting dismissal that are not compelled by the federal courts' limited authority over certain categories of matters or certain individual litigants before

first establishing subject-matter jurisdiction.  *See Steel Co.*, 523 U.S. at 89, 118 S.

Ct. at 1010.  The factual background of *Sinochem* involved a suit brought in

federal court by a Malaysian shipping company against a Chinese importer seeking

compensation for misrepresentations the Chinese importer allegedly made to a

Chinese admiralty court to secure a judgment against the Malaysian shipping

company.  549 U.S. at 426–27, 127 S. Ct. at 1188–89.  The Chinese importer

moved to dismiss the suit on several grounds, including lack of subject-matter and

personal jurisdiction, international comity, and relevant here, the nonjurisdictional

doctrine of *forum non conveniens*.[1]  *Id.* at 427, 127 S. Ct. at 1189.

The *Sinochem* Court held that a district court may "bypass[] questions of

subject-matter and personal jurisdiction" and dismiss a suit under the doctrine of

*forum non conveniens* "when considerations of convenience, fairness, and judicial

economy so warrant."  *Id.* at 432, 127 S. Ct. at 1192.  The Court reasoned that the

factual circumstance before it presented "a textbook case for immediate *forum non*

*conveniens* dismissal" while the required subject-matter inquiry would have

"presented an issue of first impression" requiring analysis "at some length" and

"[d]iscovery concerning personal jurisdiction would have burdened [the Chinese

---

[1] The doctrine of *forum non conveniens* vests district courts with the discretion to dismiss a case when another forum would have jurisdiction and trying the case in the plaintiff's chosen forum would be oppressive or vexatious to the defendant or would be otherwise inappropriate based on a weighing of several private- and public-interest factors.  The doctrine of *forum non conveniens* is not mandatory and is therefore nonjurisdictional.  *See generally Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241, 102 S. Ct. 252, 258, 70 L. Ed. 2d 419 (1981).

importer] with expense and delay." *Id.* at 435, 127 S. Ct. at 1194.  Given that the

district court "inevitably would dismiss the case without reaching the merits,"

requiring a jurisdictional inquiry first would be "all to scant purpose." *Id.*  When

"subject-matter or personal jurisdiction is difficult to determine" and the relevant

nonmerits "considerations weigh heavily in favor of dismissal, the court properly

takes the less burdensome course." *Id.* at 436, 127 S. Ct. at 1194.  The Court

cautioned, however, that when "a court can readily determine that it lacks

jurisdiction over the cause or the defendant, the proper course would be to dismiss

on that ground." *Id.*

   In *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 130 S. Ct. 2323, 176 L.

Ed. 2d 1131 (2010), over the objections of Justices Thomas and Scalia, a six-

member majority of the Supreme Court implicitly clarified the caveat in *Sinochem*

that the "proper course" for courts that can "readily determine" a jurisdictional

nonmerits ground for dismissal is "to dismiss on that ground."[2]  The issue in *Levin*

was whether a group of producers and consumers of natural gas could sue the Tax

Commissioner of Ohio for allegedly discriminatory state taxation.  *Id.* at 419, 130

S. Ct. at 2328–29.  The two primary grounds for dismissal facing the district court

were comity, which is a prudential doctrine, and the Tax Injunction Act, 28 U.S.C.

---

[2] Justice Ginsburg wrote the majority opinion on behalf of herself, Chief Justice Roberts
and Justices Stevens, Kennedy, Breyer, and Sotomayor, to which Justice Thomas, joined by
Justice Scalia, took exception in his concurrence.  Justices Kennedy and Alito each added a brief
concurrence as well.

§ 1341, which is jurisdictional in nature. *Id.* The majority ultimately concluded that comity required that the case be brought first in the Ohio courts and declined to reach the scope of the Tax Injunction Act, citing *Sinochem* for the proposition that a "federal court has flexibility to choose among threshold grounds for dismissal." *See id.* at 432, 130 S. Ct. at 2336–37 (citing *Sinochem*, 549 U.S. at 431, 127 S. Ct. at 1191).

Justice Thomas, writing for himself and Justice Scalia, concluded that the *Levin* majority erred by not instead ruling on the jurisdictional grounds for dismissal under the Tax Injunction Act. Justice Thomas faulted the majority for its "misplaced" reliance on *Sinochem* "because it confuses the fact that a court *may*" dismiss a case on a nonmerits ground before deciding a jurisdictional ground "with whether, and when, it *should*." *Id.* at 434, 130 S. Ct. at 2337–38 (Thomas, J., concurring). Justice Thomas distinguished the situation in *Levin* from that in *Sinochem* where the Court determined that it was proper to rule first on the *forum non conveniens* ground for dismissal before reaching the pending jurisdictional challenges on grounds of efficiency. In *Levin*, however, there was "no economy to deciding the case on the nonjurisdictional ground" because "[t]he same analysis that supports dismissal for comity reasons subjects this case to the [Tax Injunction] Act's jurisdictional prohibition." *Id.* at 435, 130 S. Ct. at 2338 By declining to follow "the settled principle that judges presented with multiple non-merits

grounds for dismissal should dismiss on jurisdictional grounds first," the majority

illegitimately "upends" an "important area of the law." *Id.* at 436, 130 S. Ct. at

2339.  Justice Thomas's stricter reading of *Sinochem*'s preference for jurisdictional

nonmerits rulings, however, garnered only two votes.

Distilling what we know from the jurisdictional-sequencing trilogy of *Steel*

*Co.*, *Ruhrgas*, and *Sinochem*, as later clarified in *Levin*, several key themes emerge.

First, though the federal courts lack the power to issue a merits ruling without the

jurisdiction to do so, there is no bright-line rule that categorically determines which

nonmerits grounds for dismissing a case must be addressed in which order.

Second, it is clear that the district courts have some degree of leeway to sequence

these nonmerits grounds for dismissal, but this discretion is not unbounded.  The

necessary inquiry courts must make when deciding between available nonmerits

grounds for dismissal is guided by a non-exhaustive and case-specific set of

considerations.  Those considerations may include convenience, fairness, the

interests served by structural principles such as federalism and comity, and judicial

economy and efficiency.  Third, although no "jurisdictional hierarchy" requires

courts to determine subject-matter jurisdiction before personal jurisdiction, courts

are generally expected to resolve jurisdictional nonmerits grounds for dismissal

before nonjurisdictional nonmerits grounds.  As *Levin* suggests, however, this

preference is hardly insurmountable and may be overcome even in circumstances

40

that do not require the parties or the court to expend additional time or resources before reaching a decision.

## II.

To the best of my knowledge, this appears to be the first case squarely presenting a sequencing challenge to a district court's decision to dismiss a case on the jurisdictional ground of sovereign immunity under Rule 12(b)(1) rather than the nonjurisdictional ground of indispensability under Rule 19(b).[3]  In addition to the novelty of the question it presents, this case is further complicated by its procedural posture, which includes two sovereign entities each asserting distinct theories favoring dismissal in response to the Conservationists' challenge to an intricate federal-state regulatory regime.  Balancing the unique circumstances of this case in light of the interests served by the Water District's indispensability under Rule 19(b) and the Corps's claim to sovereign immunity, I believe the District Court abused its discretion when it failed, as a matter of law, to properly calibrate these interests.  Given their proper weight, the interests at stake in this case tip the balance overwhelmingly in favor of dismissal under Rule 19(b). Because the District Court in the absence of the Water District improperly reached

---

[3] Although the issue was never reached because the case was ultimately disposed of on comity grounds, the state-party defendant in *Levin* also raised Rule 19(b) as an alternative ground for dismissal because the plaintiffs failed to join other state utilities involved in administering the allegedly discriminatory state tax.  *See Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 419 n.1, 130 S. Ct. 2323, 2329 n.1, 176 L. Ed. 2d 1131 (2010).

the scope of the Corps's sovereign immunity, I believe this Court should have

vacated that portion of the District Court's ruling.

First and most critically, the very reasons the Water District is an

indispensable party under Rule 19(b) also counsel that Rule 19(b) is the ground

that should dispose of this case.  The "concrete form" of the dignity and comity

interests at stake in affording the proper respect due the Water District as a

sovereign entity also strongly favors dismissing the case because of the Water

District's absence.  *See Pimentel*, 553 U.S. at 865–66, 128 S. Ct. at 2190.  By

ratifying the Conservationists' voluntary dismissal of the Water District and

unnecessarily proceeding to reach the scope of the Corps's immunity under the

navigation-maintenance exception, the District Court set the stage for a potentially

expansive ruling in the Water District's absence.  Granting the Corps broad

immunity would directly and adversely affect the delicate balance of power struck

by the United States and the State of Florida in their management of the Waterway.

The Conservationists, whose narrow concerns in this particular litigation do not

align with the full range of regulatory interests possessed by the Water District,

cannot be expected to serve as an adequate representative of the Water District if

the Water District were not joined as a party.  And even if the Water District could

have waived its Eleventh Amendment immunity or participated as amicus curiae,

these limited accommodations would fail to fully vindicate the Water District's

sovereign interests, whether by forcing the Water District to forfeit its rightful immunity from suit or by treating the Water District as little more than an interested bystander.  When taken together with the other interests at stake and absent substantial countervailing reasons, the Water District's sovereign interests strongly favor dismissal under Rule 19(b).

Second, the Rule 19(b) issue in this case is straightforward and easily resolved whereas defining the scope of the Corps's immunity under the Clean Water Act's navigation-maintenance exception is not.  Defining the scope of the navigation-maintenance exception here would require interpreting a much-contested and unsettled provision of the Clean Water Act in light of the principles announced in the Supreme Court's decision in *Central Green Co. v. United States*, 531 U.S. 425, 121 S. Ct. 1005, 148 L. Ed. 2d 919 (2001).  And to the extent the answer to that question touches on the constitutional limits of the Corps's authority, the principles of constitutional avoidance outlined by Justice Brandeis in *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–48, 56 S. Ct. 466, 482–84, 80 L. Ed. 688 (1936) (Brandeis, J., concurring), likewise counsel in favor of dismissal on other grounds.  *Cf. Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73, 121 S. Ct. 675, 683, 148 L. Ed. 2d 576 (2001) (declining to defer to the Corps's regulation of the term "navigable waters" in the Clean Water Act when "an administrative interpretation of a statute

43

invokes the outer limits of Congress' power," especially when doing so would
"alter[] the federal-state framework by permitting federal encroachment upon a
traditional state power").

Moreover, the relative ease of deciding the Rule 19(b) ground is made even
starker when, as is the case here, the governing federal substantive law at issue
expressly indicates that the Water District is at the very least a "necessary" party to
any such proceedings. *See* 33 U.S.C. § 1323(a). Indeed, the Water District's
indispensability in this case is so obvious that the District Court raised it, on its
own, as an alternative ground for dismissal. The District Court even went so far as
to note that "[t]he [Water] District argues with considerable force that it is indeed
an indispensible party, even without regard to the state statute explicitly addressing
this issue"—that is, for the purposes of Rule 19(b) urged by the Water District. It
is thus a little baffling that the District Court, despite undertaking essentially all of
the analysis needed to determine the Rule 19(b) issue, simply declined to rule on
this ground at all, much less that it declined to do so as its exclusive basis for
dismissal. The District Court rejected the Water District's repeated calls to rest its
holding on Rule 19(b) as follows:

> I disagree. Even if a district court *may* address other issues without
> deciding whether it has subject-matter jurisdiction, the assertion that a
> district court *must* address other issues first is a hard sell. The Army
> Corps has properly raised the issue of subject-matter jurisdiction. I
> choose to address that issue first, and to address the indispensable-
> party issue only as an alternative basis for dismissal.

Although the District Court was of course correct to note that it possesses a case-appropriate level of discretion to sequence nonmerits grounds for dismissal, that discretion is not unfettered.  And though district courts need not explicitly spell out their reasons for choosing how to best manage their own dockets and sequence threshold determinations—and I do not propose to impose any sort of additional clear-statement requirement for sequencing decisions—the basis for the exercise of that discretion must rest on some discernible rationale that is not substantially outweighed by the sort of countervailing considerations relied on in *Steel Co.*, *Ruhrgas*, and *Sinochem*.  Below I evaluate several rationales that may have motivated the District Court to prioritize dismissing the case based on the Corps's immunity rather than the Water District's indispensability.  The relative ease of determining the Water District's indispensability compared to the difficulty of determining the scope of the Corps's immunity, however, strongly favors dismissal under Rule 19(b).

Third, ruling on the Water District's indispensability is a narrower ground for dismissing the case than would be holding that the Corps is immune from suit under the navigation-maintenance exception.  By holding the Water District indispensable for purposes of the Conservationists' suit, the District Court gives full effect to the Water District's immunity from suit without impinging to the slightest degree on the Corps.  Nor would such a ruling have the potential to upset

45

the delicate balance of concurrent authority shared by the Water District and the

Corps for purposes of managing the Waterway.  In contrast, by entering a ruling on

the scope of the Corps's immunity unnecessary to dispose of this case after the

Conservationists managed to drop the Water District from the proceedings, the

District Court ran the risk of interpreting the unsettled issue of the Corps's

immunity too broadly, a risk exacerbated by the Water District's inability to

participate fully as a party to the suit.[4]  Because Rule 19(b), as the Supreme

Court's decision in *Pimentel* makes clear, functions in part to protect these sorts of

sovereign interests, the broader nature of a determination of the Corps's immunity

also favors dismissal under Rule 19(b).

Fourth, the resources expended by the parties involved in this litigation and

the District Court that were required to assess the Corps's immunity and determine

the lack of subject-matter jurisdiction as a factual matter under Rule 12(b)(1)

appear to be significantly more extensive than would have been necessary to

decide the Water District's indispensability under Rule 19(b).  I suspect that the

case could have been disposed of simply by allowing responsive briefing and

argument after the Water District first moved to dismiss the case under Rule 19(b)

and taking judicial notice of the way in which federal and state agencies share

jurisdiction over managing the Waterway.  Even if some additional fact-finding

---

[4] As noted above, I express no opinion as to the scope of the Corps's immunity under the navigation-maintenance exception.

would have been called for, such efforts would, at a minimum, need not have been any more extensive than the remarkably generative efforts that have given root to and sustained the procedural thicket that appears fully formed before us.

Importantly, I do not want to overstate my reliance on these efficiency considerations. With the benefit of hindsight, appellate courts can easily second-guess the on-the-ground determinations that district courts must make prospectively when deciding between alternative grounds for dismissal. The difficulty and uncertainty inherent in making necessarily case-specific decisions justifies the district courts' discretion in the first place, and weighing the likely costs of alternative threshold grounds for dismissal is precisely where that discretion is at its apex. As a general matter, then, the mere fact that a district court's chosen ground for dismissal later appears to have proven more resource-intensive to decide than would have an available alternative should not constitute an abuse of discretion. Here, the excessive amount of time and effort spent in these proceedings that could have been avoided is simply another, but by no means dispositive, consideration favoring dismissal under Rule 19(b).

Taken together, the Water District's sovereign interests, the relative ease of the alternative analyses, the narrower decisional grounds, and the fewer resources required to determine the issues weigh heavily in favor of dismissal under Rule 19(b). On the other side of the balance, the Corps points us to two considerations

that may have motivated the District Court's decision that the Corps believes offset the considerations favoring dismissal under Rule 19(b):  first, that reaching the Corps's immunity would comport with the general preference in sequencing decisions for resolving jurisdictional grounds before reaching other nonjurisdictional threshold grounds for dismissal; and second, that the finality of judgments is better served by dismissing on the ground of the Corps's immunity.

I disagree.  The first countervailing consideration the Corps directs our attention to is the general preference for deciding a jurisdictional threshold ground before a nonjurisdictional one.  *See Sinochem*, 549 U.S. at 436, 127 S. Ct. at 1194 (noting that when "a court can readily determine that it lacks jurisdiction over the cause or the defendant, the proper course would be to dismiss on that ground.").  I do agree that, all else being equal, courts should reach jurisdictional threshold grounds first.  But this general preference is just that—a preference.  And as the Supreme Court's recent decision in *Levin* implies, that preference is hardly insurmountable and all else is rarely equal.  Moreover, the force of this preference is even further diminished here because the nonjurisdictional Rule 19(b) ground for dismissal in turn rests in large part on the Water District's Eleventh Amendment immunity from suit.  We have previously recognized that an "assertion of Eleventh Amendment immunity essentially challenges a court's subject matter jurisdiction." *Seaborn v. State of Fla., Dep't of Corr.*, 143 F.3d 1405, 1407 (11th Cir. 1998); *but*

*see Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1084–85 (D.C. Cir. 2011) (noting that "there is considerable uncertainty about sequencing in the Eleventh Amendment context"). As a result, whatever the strength of this general preference for jurisdictional threshold rulings, which would not be dispositive in any event, that preference provides only slight support for reaching the Corps's immunity under these circumstances. Again, the unique procedural posture of this case makes it the rare one in which the proper course is to dismiss on a nonjurisdictional threshold ground before reaching a jurisdictional one. But the general preference for deciding jurisdictional grounds first did not alone relieve the District Court from taking into account the other considerations at stake.

Similarly unavailing is the Corps's remaining rationale of respecting the finality of judgments. In line with the Corps's theory, the District Court could have decided that dismissing the case for lack of subject-matter jurisdiction on the basis of the Corps's immunity, which would have been a dismissal with prejudice, would put a decisive end to the Conservationists' likely resort to further litigation. Read charitably, the Corps seems to be arguing that if the District Court were to dismiss the case under Rule 19(b) and decline to reach the scope of the Corps's immunity, the Conservationists might then refile their case in Florida state court, where the Water District might be amenable to suit because the Eleventh

49

Amendment would not apply.  *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*,
535 U.S. 613, 616, 122 S. Ct. 1640, 1642, 152 L. Ed. 2d 806 (2002).  If that were
to happen, the Corps would then likely remove the newly refiled case to federal
court, bringing the Conservationists' suit full circle.

These purported finality concerns are overblown.  The Corps's hypothetical,
whatever its plausibility may be under a different set of facts, rings hollow here
because the Corps overlooks a crucial fact at the center of this litigation:  the
Conservationists brought *no* claims of any sort against the Water District, which
was joined solely for the purpose of complying with the governing federal and
state law under which the Conservationists sued the Corps.  Should a refiled case
be removed to federal court, the parties would then be in essentially the same
position they currently occupy.  The Water District would once again move to be
dismissed as a party and to have the case dismissed under Rule 19(b) because the
case cannot proceed in its absence.  Moreover, dismissal would also be compelled
by principles of res judicata—just as would be the case if the Conservationists had
refiled the same suit were the District Court's ruling on the Corps's sovereign
immunity to stand.  *Cf. Pimentel*, 553 U.S. at 872, 128 S. Ct. at 2193 ("As matters
presently stand, in any later suit against it Merrill Lynch may seek to join the
Republic and the Commission and have the action dismissed under Rule 19(b)
should they again assert sovereign immunity.").  Should the Conservationists'

hypothetical refiled case remain in state court, both the Water District and the Corps would be free to assert any available ground warranting dismissal of the case—which is likely one of the reasons the Conservationists decided against filing their suit in state court in the first place.

In short, I struggle to see what, if any, interest in finality would be served by granting the Corps's preferred sovereign-immunity ground for dismissal that would not be served just as effectively as dismissing the case on the Rule 19(b) ground. To the extent the Corps is seeking an interest not in the finality of this particular litigation but rather an interest in having a court declare that it is immune from all litigation of this sort, such an interest is inapposite to determining how best to sequence threshold grounds for dismissal in any particular case.  In line with the case-by-case nature of these determinations, which will necessarily result in nonmerits rulings, courts should be careful not to credit such far-reaching and speculative concerns.  This is especially true when, as is the case here, the party seeking the broader ruling attempts to do so to the potential detriment of an absent sovereign entity whose absence is itself an independent ground warranting dismissal.

The general preference for dismissal on jurisdictional grounds and the concern for the finality of judgments cited by the Corps are insufficient, taken alone and taken together, to counterbalance the considerations that

overwhelmingly tip in favor of dismissing the Conservationists' suit under

Rule 19(b).  Whatever the precise outer boundaries of the discretion to sequence

threshold nonmerits grounds for dismissal may prove to be in other cases, a

question which we do not today determine, it is clear that the District Court

exceeded those bounds here.